**WILLIAM C. HAAS & CO., INC., Appellant,**

v.

**CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, Respondent.**

No. 77–2486.

United States Court of Appeals, Ninth Circuit.

Oct. 4, 1979.

---

18. R.T., vol. VII, pp. 26–37.

19. R.T., vol. VII, p. 45.

Herman M. Shaffer, Kansas City, Mo., argued, for appellant.

Burk E. Delventhal, Deputy City Atty., San Francisco, Cal., argued and on brief, for respondent.

Before HUFSTEDLER and GOODWIN, Circuit Judges, and JAMESON,* District Judge.

HUFSTEDLER, Circuit Judge:

William C. Haas & Co., Inc. ("Haas") brought this diversity action against the City and County of San Francisco ("City") claiming that the City's rezoning of its property and the imposition of other land use restrictions so far diminished the value of its property as to constitute a taking for which it is entitled to just compensation protected by the Fourteenth Amendment. The district court granted summary judgment in favor of the City, and Haas appeals. We uphold the district court because we conclude that (1) the land use restrictions imposed by the City upon Haas' property were not unconstitutional as applied to that property, and (2) the impairment of the economic value of the property, although substantial, was not sufficient to give rise to a constitutional claim to just compensation.

This controversy has a long history, punctuated by years of litigation before administrative agencies, and federal and state courts. On June 28, 1971, Haas entered a land purchase agreement to buy a large parcel of unimproved land in the Russian Hill neighborhood of San Francisco. The agreement was conditioned upon Haas' procurement of a valid site permit from the requisite city agency. When Haas first applied to the San Francisco Planning Com-

---

* Honorable William J. Jameson, Senior United States District Judge, District of Montana, sitting by designation.

mission for a site permit, on July 7, 1971, the property was zoned R–5, permitting the high-rise development that Haas proposed. The City Planning Commission denied the permit on the ground that the project would have a detrimental effect on the City as a whole and upon the residents and property of the neighborhood. The Commission also relied upon an "Urban Design Plan," containing general environmental policies for the City developed over several years to be included in the City's Master Plan. Haas appealed to the Board of Permit Appeals on August 13, 1971. Two weeks later, while the appeal was pending, the Commission formally adopted the Urban Design Plan as part of the Master Plan of San Francisco. On August 26, 1971, the Commission adopted interim controls establishing height and bulk restrictions which, among other things, limited the maximum height to 300 feet. Haas withdrew its appeal, and on November 9, 1971, submitted new plans for approval by the Commission. The new plans as amended complied with the 300-foot height restriction as well as the bulk restriction. After a public hearing, the Commission approved the application for the site permit on the revised plans. The neighbors' efforts to stop the high-rise project failed when the Board of Permit Appeals, approving the permit, denied a petition for rehearing on April 10, 1972.

Pursuant to Haas' contract to purchase the land within seven days after the site permit became final, Haas paid $1,650,000 to the vendor of the property, and it also paid brokers' commissions, real estate taxes, and other fees of more than $165,000.

Haas immediately broke ground and commenced the construction project. The Russian Hill Improvement Association was equally prompt in taking steps to halt the project. On April 20, 1972, the Association filed a petition for writ of mandate in the Superior Court in San Francisco. Haas won the first round in the trial court, but the California Court of Appeal overturned the Superior Court and issued the writ on the ground that the permit was invalid for failure to comply with the California Environmental Quality Act of 1970 and the 1972 amendments thereto (Pub. Resources Code §§ 21000–21174). The California Court of Appeal held that Haas was not protected by the grandfather clause because Haas had not undertaken substantial construction and incurred substantial liabilities for construction in good faith reliance upon the issuance of a permit prior to the commencement of judicial proceedings. (*Russian Hill Improvement Association v. Board of Permit Appeals* (1974) 44 Cal.App.3d 158, 164, 118 Cal.Rptr. 490.) Haas' efforts to foreclose application of the environmental laws to it on constitutional grounds failed in the California judiciary and in the United States Supreme Court. (*William C. Haas & Co., Inc. v. Russian Hill Improvement Association* (1975) 422 U.S. 1030, 95 S.Ct. 2646, 45 L.Ed.2d 687 (dismissing appeal for want of substantial federal question).)

With the invalidation of its site permit, Haas had to start all over again. By this time, however, Haas faced insurmountable barriers to its high-rise project because, in the interim, the City Planning Commission had adopted a 40-foot height limitation, promulgated density controls, and rezoned the property from R–5 to R–3.

Haas filed this case in the federal district court in April, 1975, in which it challenged the constitutionality of the rezoning and other land use restrictions as applied to its Russian Hill property, contending that the combined impact of the restrictions destroyed the value of the property and that it was entitled to over ten million dollars to compensate it for both the diminution in the value of the property and consequential damages flowing from frustration of its planned development.

■ Because we hold that, on the undisputed facts, Haas, as a matter of law, could not successfully maintain its inverse condemnation action, we do not reach any other issue in the case. It is therefore unnecessary for us to discuss the extent to which the judgment in the *Russian Hill Improvement Association* case precludes Haas from litigating its claim that it purchased the property and incurred contractual obliga-

tions to architects and construction companies in good faith reliance on the validity of the permit. We have no occasion to decide the correct measure of damages in an inverse condemnation action. Finally, we need not discuss California's interpretation of the doctrine of "taking" in an inverse condemnation context because controlling federal authority dooms Haas's action.

We do not separate Haas' attack on the constitutional validity of the zoning ordinance and the planned use regulations as applied to its property and its claim that the combination of the ordinance and regulations constituted a taking because both contentions rest upon the same premise: The rezoning and land use restrictions imposed on Haas are so grossly disproportionate to the benefits conceivably inuring to the public in promoting the general welfare that the regulatory scheme, as applied to Haas constitutes an uncompensated taking, or, at the minimum, the record creates a triable issue of fact on the constitutional question.

 As the City recognizes, governmental action in the form of regulation can "be so onerous as to constitute a taking which constitutionally requires compensation." (*Goldblatt v. Hempstead* (1962) 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130.) Moreover, the Supreme Court has acknowledged that it "has been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the Government, rather than remain disproportionately concentrated on a few persons. See *Goldblatt v. Hempstead*, 369 U.S. 590, 594, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962)." (*Penn Central Transportation Co. v. New York City* (1978) 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631.)

Land use restrictions, reasonably related to the promotion of the health, safety, morals, or general welfare, have been repeatedly upheld even though the challenged regulations destroyed or adversely affected recognized real property interests or flatly prohibited the most beneficial use of the property. (*Penn Central Transportation Co. v.*

*New York City, supra,* 438 U.S. at 125, 98 S.Ct. 2646.) Haas necessarily agrees that the zoning and land use restrictions applied to its property did promote the general welfare by decreasing population density in the Russian Hill area, preserved light and air available to the neighbors, and served the aesthetic values enjoyed by the City as a whole. Haas also recognizes that diminution of the value of its property by destroying its highest and best use by land use restrictions reasonably related to the general welfare cannot be the basis for a successful constitutional attack. Thus, accepting as true the valuation evidence most favorable to Haas, the value of its property was reduced from about $2,000,000 to about $100,000. Diminution of value on a similar scale was upheld in *Hadacheck v. Sebastian* (1915) 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (regulations reduced land value from $800,000 to $60,000). Haas has attempted to avoid the impact of *Hadacheck* by arguing that the nature, quality, and amount of benefit to the general welfare is inadequate constitutionally to offset the individual economic burden that the restrictions forced Haas to endure. We disagree.

 "[D]ecisions sustaining other land use regulations . . . reasonably related to the promotion of the general welfare, uniformly reject the proposition that diminution ·in property value, standing alone, can establish a taking, [citations omitted] and that the taking issue in these contexts is resolved by focusing on the uses the regulations permit." (*Penn Central Transportation Co. v. New York City, supra,* 438 U.S. at 131, 98 S.Ct. at 2663.) The regulations do not prevent Haas from developing the property, even though the planned development cannot be undertaken. Haas contends that its $1,900,000 loss in value of the property is not the full story because no use for the property remains which is "economically viable." (*Id.* at 138 n. 36, 98 S.Ct. 2646.) But Haas' argument that it cannot recover its $2,000,000 investment by constructing low-rise apartment units on the land merely restates the undisputed fact that the value of the property in Haas'

hands has been significantly diminished by the regulations. That the zoning restrictions prevent Haas from recovering its investment does not mean that they are constitutionally defective. Of course, Haas would not have paid as much for the property as it did if it had known that it would not be able to build high-rises on it. But its disappointed expectations in that regard cannot be turned into a taking, nor can Haas transform a regulation into a taking by recharacterizing the diminution of the value of its property as an inability to obtain a favorable return on its investment.

Haas' property has not been singled out from other Russian Hill properties and made to bear a disproportionate economic burden. The record contains not the slightest suggestion that the land use regulations at issue involved "reverse spot" zoning. On the contrary, the land use controls were part of a comprehensive plan for the development of the City to preserve aesthetic values and other general welfare interests of the inhabitants. The land use restrictions "were reasonably related to the implementation of a policy . . . expected to produce a widespread public benefit and applicable to all similarly situated property." (*Id.* at 133–34 n. 30, 98 S.Ct. at 2664.) All of Haas' neighbors are subject to the same restrictions upon the future development of their property as those imposed upon Haas. To be sure, at the moment, Haas appears to have suffered a disproportionate impact because no other affected landowner has as large a parcel of undeveloped land as does Haas. Nevertheless, all of the landowners in the Russian Hill area are no more able than is Haas to redevelop their property, either alone, or in combination with other landowners, for high-rise apartments.

Haas has suffered a serious economic loss, and a frustration that it is not equally borne by the owners of adjacent parcels. That the loss is heavy and that Haas must bear more than its proportionate share of the burden for the sake of the general welfare, however, did not convert the regulation into a taking.

AFFIRMED.